UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | **FILED UNDER SEAL** |
| | : | |
| | : | MISC. NO.: 3:18Mj 187 JGM |
| | : | |
| COUNTY OF NEW HAVEN | : | February 8, 2018 |

### AFFIDAVIT

I, Jason Creatore, a Task Force Officer with the Drug Enforcement Administration, having been duly sworn, do hereby state:

### I. AFFIANT'S TRAINING AND EXPERIANCE

1. I am a Task Force Officer of the Drug Enforcement Administration (DEA) and have been so employed since 2016. Currently, I am assigned to the Bridgeport High Intensity Drug Trafficking Area Task Force (HIDTA Task Force), which is comprised of personnel from the DEA, Norwalk Police Department, Stamford Police Department, Stratford Police Department, Milford Police Department, Bridgeport Police Department, Trumbull Police Department and the Connecticut State Police.

2. I am a sworn member of the Stratford Police Department and has been so employed with the Department since October 2006. Currently, I am assigned to the Town of Stratford Narcotics, Vice and Intelligence Unit and as a Detective in this unit I am tasked with handling criminal investigations involving crimes of violence and narcotics trafficking.

3. I am an investigative or law enforcement officer of the United States within the meaning if Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

1



4. During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved drug trafficking offenses, tracking the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations. Search warrants relating to these investigations have covered vehicles, businesses and residences of drug traffickers and their co-conspirators. In addition, these search warrants have also covered "stash houses" used as storage and distribution points for controlled substances and United States currency used by drug dealers for their unlawful drug trafficking activities.

5. Materials searched for and recovered in these locations have included various controlled substances, drug paraphernalia, books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution, currency and money wrappers, records of bank transactions made to conceal and launder drug trafficking proceeds, cellular telephones, paging devices, computers and computer disks, answering machines, and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained during the execution of said search warrants have constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

6. Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

    a.    drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

    b.    drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

    c.    even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

    d.    drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes or lock boxes;

    e.    drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed; these materials are often maintained within the electronic memory of personal computers, i-Pads, i-Phones or other computerized wireless telephones,



    tablets, external hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the drug traffickers;

f. drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above mentioned books, computerized records, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g. drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h. drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates in hard copy and also on electronic devices, such as their cellular telephones, tablets, and other computing and electronic communication devices;

i. drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of record to assist the trafficker in the collection of drug debts;

j. drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled

4

      substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets; these items are also commonly stored in the memory or electronic devices found within their homes, such as cellular telephones, tablets, laptops, and other electronic communication and computing devices;

k.   drug traffickers will commonly conceal within their residences or within the curtilage of their residences, currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.   drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m.   persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.   drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers' possession or residence or are frequently stored electronically on wireless telephones, i-Pads, computers, and other electronic devices;

  o. based on my training and experience, drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

  p. based on my training and experience, drug dealers often create secret locations, commonly called "traps," in their automobiles. Often, drug dealers will use these automobiles to store narcotics, weapons, money and other items and documents related to their drug trade; and

  q. based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities in their cars, homes, garages and out buildings, and in safes or lock boxes maintained at such locations.

## II. INTRODUCTION CONCERNING THE INSTANT INVESTIGATION

7. I am currently participating in an investigation of **TALVIN HINTON** and others, for violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute and distribution of narcotics and conspiracy to distribute controlled substances) (hereafter referred to as the "Target Offenses").

8. I am one of the case agents who have directed the investigation that is the subject of this Affidavit. I have done so in conjunction with law enforcement agents and officers. I am thoroughly familiar with the information contained herein.

9. This affidavit includes only those facts which relate to the need for, and propriety of, the requested authorization. This affidavit does not purport to set forth all of the facts gathered

during the course of the investigation of this matter. I am thoroughly familiar with the information contained in this affidavit.

10. This affidavit is submitted in support of an application for an Order authorizing the installation and use of pen-register devices or processes, trap-and-trace devices or processes, and the disclosure of certain electronic communications records and/or information, with regard to Target Telephone 1, which is described more fully below. The aforementioned information and records (hereafter "Pen Register Information") have not been requested previously.

11. With regard to the aforementioned Pen Register Information, this affidavit sets forth a) sufficient information to establish that there are reasonable grounds to believe that the information likely to be obtained by the installation and use of a pen register device or process and a trap-and-trace device or process on Target Telephone 1 is relevant to an ongoing investigation; and, b) sufficiently specific and articulable facts to establish that there are reasonable grounds to believe that the that electronic communications records and/or information sought is relevant and material to an ongoing criminal investigation.

12. This affidavit is also submitted in support of, and serves as, an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and Sections 18 U.S.C. 2703(c)(1)(A) and 2711(3), authorizing agents of the DEA to ascertain the physical location of Target Telephone 1 which is described more fully below, including but not limited to E-911

Phase II data or other precise location information concerning Target Telephone 1 (the "Requested Location Information")[1] for a period of thirty (30) days.[2]

13. With regard to the Requested Location Information, for the reasons set forth herein, there is probable cause to believe, and I do believe, that the Target Offenses have been committed, are being committed, and will continue to be committed by the users of Target Telephone 1, namely HINTON. There is, moreover, probable cause to believe that the Requested Location Information will constitute or lead to evidence of the Target Offenses, and the location and apprehension of HINTON.

### III.  DESCRIPTION OF TARGET TELEPHONE 1

14. Target Telephone 1 is a prepaid cellular telephone, assigned telephone number (959) 222-0031, who service is provided by Sprint. Target Telephone 1 is used by TALVIN HINTON.

### IV.  THE INVESTIGATION

15. Since January 2018, the undersigned Affiant, along with other law enforcement officers, have been investigating HINTON and other individuals, for the unlawful distribution of heroin and/or fentanyl in and around Bridgeport, Connecticut.

16. As part of the investigation, we have utilized a confidential source (CS) to conduct controlled purchases of heroin from HINTON. This CS (hereafter referred to as "CS #1") CS #1 has been a paid informant for approximately three years. During this time,

---

[1] Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by Target Telephone 1 at the start and end of any call. In requesting cell site information, the Government does not concede that such cell site records – routinely retained by wireless carriers as business records – may only be obtained via a warrant issued on probable cause. *See In re Application*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. §§ 2703(d) & 3121 et seq.).

[2] On January 12, 2018, a state court judge signed a search warrant authorizing the collection of the Requested Location Information. This authorization is scheduled to expire on February 11, 2018.

CS #1 has provided information to law enforcement which, after corroboration, has led to large investigations and the arrest and conviction of individuals engaged in narcotics trafficking.

### A. INFORMATION CONCERNING THE OVERDOSE DEATH

1. In addition to the investigation concerning HINTON's narcotics distribution, the undersigned Affiant obtained information regarding an overdose death in Stratford, including but not limited to, the details described below.

2. On September 23, 2017, SPD officers responded to a suspected overdose death in Stratford, Connecticut. Officers located a twenty-five-year-old female, whose name and identity are known to the undersigned Affiant and is hereinafter referred to as VICTIM #1, located in the bathroom of her home. VICTIM #1 was taken to the hospital where she was subsequently pronounced deceased.

3. From inside the bathroom, officers recovered nine (9) bags bearing a "happy face" stamp that each appeared to contain heroin. Officers also recovered other evidence of drug use including a syringe.

4. Officers obtained consent from VICTIM #1's boyfriend to search VICTIM #1's phone. Unfortunately, officers were unable to recover any information from the phone other than the telephone number assigned to the phone.[3]

5. The medical examiner subsequently determined that VICTIM #1 died as a result of multidrug toxicity including heroin, fentanyl, para-fluorobutyryl fentanyl, and 4-ANPP.

6. Through the subsequent investigation including interviews of VICTIM #1's family and friends, an analysis of VICTIM #1's call records, and a state search warrant authorization

---

[3] Because of the phone's condition, officers employed a forensic method known as chip-off in an attempt to access information on VICTIM #1 phone. This method destroyed her phone.



location data for Target Telephone 1, officers believe HINTON is the source of the heroin VICTIM #1 purchased.

### B. CONTROLLED PURCHASE PROCEDURES

7. For each of the controlled purchases of heroin described herein, the following procedures were followed. Investigators would meet with the CS at a pre-determined location. The CS would call the target in the presence of the investigators. Investigators would see the number that was being dialed and would monitor the conversation that took place. Before leaving to meet with the target, the CS would be provided with official government funds with which to make the purchase. The CS's person and/or vehicle would be searched prior to leaving to meet with the target to ensure that s/he had no other monies on his/her person and possessed no contraband. The CS was equipped with recording and transmitting devices. Whenever possible, the meeting between the CS and the target would be live-monitored and physically observed by investigators. Once the CS returned to the designated location, s/he would provide the investigators with the purchased controlled substance(s). If the CS completed the transaction, s/he would be searched for any contraband or remaining government funds. As soon as practical, and always prior to being packaged as evidence, the controlled substance(s) would be field tested for the presence of heroin.

### C. FIRST CONTROLLED PURCHASE FROM HINTON

8. During the week beginning January 8, 2018, the exact date being known to the undersigned affidavit, officers met with CS #1 at a secure location for the purposes of conducting a controlled purchase of heroin from HINTON. CS #1 was provided with



funds to complete the transaction.[4] In the presence of officers, CS #1 contacted HINTON by calling Target Telephone 1 and arranged to meet HINTON for the purpose of purchasing heroin.

9. HINTON and CS #1 subsequently met and conducted a hand-to-hand narcotics transaction in the area of Derby, Connecticut. During the recorded conversation between CS #1 and HINTON, HINTON assured CS #1 that the heroin was of high quality. HINTON and CS #1 discussed pricing for future heroin purchases.

10. CS #1 purchased e waxy folds containing suspected heroin from HINTON. A portion of the suspected heroin purchased by HINTON was field-tested. The test returned a positive reaction for the presence of heroin.[5] Following the controlled purchase, officers showed CS #1 a photo of HINTON. CS #1 identified HINTON as the individual from whom she/he had obtained the heroin.

### D. SECOND CONTROLLED PURCHASE FROM HINTON

11. During the week beginning January 15, 2018, the exact date being known to the undersigned affidavit, investigators met with CS #1 at a secure location for the purposes of conducting a controlled purchase of heroin from HINTON. CS #1 was provided with funds to complete the transaction.[6] In the presence of officers, CS #1 contacted HINTON by calling Target Telephone 1.

12. HINTON and CS #1 subsequently met and conducted a hand-to-hand narcotics transaction in the area of Bridgeport, Connecticut. During the recorded conversation between CS #1 and HINTON, HINTON assured CS #1 that the heroin was of high

---

[4] The precise amount is known to the undersigned affiant and is not disclosed to protect CS #1's identity
[5] Lab results are pending.
[6] The precise amount is known to the undersigned affiant and is not disclosed to protect CS #1's identity.

11

quality but that he (HINTON) would soon have even better quality heroin. HINTON and CS #1 discussed the possibility of CS #1 purchasing a larger quantity of heroin.

13. CS #1 described HINTON as wearing a black hat, black jacket and jeans. A portion of the suspected heroin purchased from HINTON was field-tested. The test returned a positive reaction for the presence of heroin.[7] Following the controlled purchase, officers showed CS #1 a photo of HINTON. CS #1 identified HINTON as the individual from whom she/he had obtained the heroin.

### E. THIRD CONTROLLED PURCHASE FROM HINTON

14. During the week beginning on February 5, 2018, the exact date being known to the undersigned affidavit, investigators met with CS #1 at a secure location for the purposes of conducting a controlled purchase of heroin from HINTON. CS #1 was provided with funds to complete the transaction.[8] In the presence of officers, CS #1 contacted HINTON by calling Target Telephone 1.

15. HINTON and CS #1 subsequently met and conducted a hand-to-hand narcotics transaction in the area of Bridgeport, Connecticut. The meeting was video-recorded. A portion of the suspected heroin purchased from HINTON was field-tested. The test returned a positive reaction for the presence of heroin.[9]

### V. GENERAL INFORMATION REGARDING CELLULAR TELEPHONES

16. In my training and experience, I have learned Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds

---

[7] Lab results are pending.
[8] The precise amount is known to the undersigned affiant and is not disclosed to protect CS #1's identity.
[9] Lab results are pending.

12

of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

17. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of Target Telephone 1, including by initiating a signal to determine the location of Target Telephone 1 on the Sprint network or with such other reference points as may be reasonably available. Based on my training and experience, I know that Sprint can collect cell-site data about Target Telephone 1.

## VI. AUTHORIZATION REQUEST

18. This affidavit sets forth reasonable grounds to believe the information likely to be obtained by the installation and use of a pen-register device or process and trap-and-trace device or process on Target Telephone 1 is relevant to the ongoing criminal investigation described above, as required by Title 18, United States Code, Section 3123(a). In addition, this affidavit sets forth specific and articulable facts showing that there are reasonable grounds

to believe the electronic communications records and/or information concerning Target Telephone 1 is relevant and material to the ongoing criminal investigation described above, as required by Title 18, United States Code, Section 2703(d). Among other things, the Pen Register Information will assist in identifying co-conspirators by enabling agents to determine who is contacting **HINTON** in suspected furtherance of drug distribution activities and who **HINTON** is contacting in furtherance of those activities.

19. Accordingly, it is requested that the Court authorize the installation and use of a pen-register device or process and trap-and-trace device or process on Target Telephone 1 pursuant to Title 18, United States Code, Section 3123(a), and the disclosure electronic communications records and/or information concerning Target Telephone 1, pursuant to Title 18, United States Code, Section 2703(d).

20. In addition, based upon the information set forth herein, there is probable cause to believe, and I do believe, that the Requested Location Information will constitute or lead to evidence of the Target Offenses. There is probable cause to believe that **HINTON** is using Target Telephone 1, that the Requested Location Information will assist in locating Target Telephone 1, will enable agents to meaningfully direct surveillance efforts, and will, correspondingly, assist in the seizure of Target Telephone 1 and other evidence of the Target Offenses. In my experience, drug traffickers usually carry their cell phone on their person to narcotics transactions to facilitate the meeting, to communicate with the associates they intend to meet with on an on-going basis and to keep track of the whereabouts of their associates in route to a meet location. Having the cell phone on their person allows the meet location to be changed very quickly which is often a counter-surveillance ploy. In addition, having a cell phone on their person allows them to conduct

business more efficiently and while on the move even when they visit stash locations or sources of supply. Having the cell phone on their person also allows a drug trafficker to arrange other transactions while going to one transaction to ensure a consistent flow of business.

21. Accordingly, pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Sections 2703(c)(1)(A) and 2711(3), it is requested that the Court issue a warrant and Order authorizing agents of the DEA to obtain the Requested Location Information for a period of thirty (30) days.

22. It is further requested that the Court direct the carrier for Target Telephone 1 to assist agents of the DEA by providing all information, facilities, and technical assistance needed to ascertain the Requested Location Information, and further direct the carriers for Target Telephone 1 to initiate a signal to determine the location of Target Telephone 1 on the carrier's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed warrants, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user of Target Telephone 1, for a period of thirty (30) days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

23. It is further requested that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate Target Telephone 1 outside of daytime hours.

24. It is further requested that, pursuant to Title 18, United States Code, Section 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant

15

or any extensions thereof, because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation.

25. It is further requested that the warrant and this affidavit and any other related documents, as they reveal an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and the carriers for Target Telephone 1 as necessary to effectuate the Court's Order.

JASON CREATORE
Task Force Officer of the
Drug Enforcement Administration

Subscribed and sworn to before me
this ⁹ᵗʰ day of February, 2018.

/s/ Judge Joan G. Margolis

JOAN G. MARGOLIS
UNITED STATES MAGISTRATE JUDGE



## **ATTACHMENT A**

**Property to Be Searched**

1. The cellular telephone (Target Telephone 1) is a prepaid cellular telephone, assigned telephone number (959) 222-0031, who service is provided by Sprint. Target Telephone 1 is used by TALVIN HINTON. Information about the location of Target Telephone 1 that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.



## ATTACHMENT B

**Particular Things to be Seized**

All information about the location of Target Telephone 1 described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of Target Telephone 1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint services, including by initiating a signal to determine the location of Target Telephone 1 on Sprint network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

